## COMMERCIAL BANK OF UTAH v. STATE et al.

No. 7636.   Decided May 12, 1952.   (244 P. 2d 364.)

See 61 C. J., Taxation, sec. 1272. Taxation of Banks. 51 Am. Jur., Taxation, secs. 929 et seq.; 145 A. L. R. 354.

*Clinton D. Vernon,* Atty. Gen., *Allen B. Sorensen,* Asst. Atty. Gen., for appellant.

*A. U. Miner* and *Pugsley, Hayes & Rampton,* all of Salt Lake City, for respondent.

WOLFE, Chief Justice.

Action by the respondent banking corporation to recover $3450 which it paid under protest in 1949 and 1950 to the bank commissioner of Utah as annual "fees for the cost of supervision and examination" of its banking houses, imposed by Sections 7-1-11 and 7-3-6, Utah Code Annotated 1943. The respondent bases his claim for recovery on the ground that the charges which it paid were not in fact fees, but were ad valorem or property taxes and as such contravene Article XIII, Sections 2, 3 and 11; Article I, Sec. 24; and Article VI, Sec. 23 of the Constitution of Utah. Only the first two mentioned provisions will be set out here inasmuch as a consideration of the other provisions is not necessary to our decision.

Art. XIII, Sec. 2:

"All tangible property in the State, not exempt under the laws of the United States, or under this constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. * * *"

Art. XIII, Sec. 3:

"The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all tangible property in the State, according to its value in money, and shall prescribe by law such regulations as shall secure a just valuation for taxation of such property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property, * * *. Intangible property may be exempted from taxation as property or it may be taxed in such manner and to such extent as the Legislature may provide. Provided that if intangible property be taxed as property at the rate thereof shall not exceed five mills on each dollar of valuation. When exempted from taxation as property, the taxable income therefrom shall be taxed under any tax based on incomes, but when taxed by the State of Utah as property, the income therefrom shall not also be taxed. * * *"

The appellants seek to uphold the legality of the charges on the theory that they were occupation or license taxes imposed by the Legislature under the authority of Article XIII, Sec. 12 of our Constitution and thus, it is argued,

not subject to the constitutional provisions relied upon by the respondent. Article XIII, Sec. 12 provides:

"Nothing in this Constitution shall be construed to prevent the Legislature from providing a stamp tax, or a tax based on income, occupation, licenses or franchises."

Secs. 7-1-11 and 7-3-6, U. C. A. 1943, which are assailed by the respondent in this action, were amended by Chaps. 10 and 12, Laws of Utah, 1951, but in order to determine whether the respondent is entitled to recover the amount paid, it is necessary to determine the constitutionality of those statutes prior to their amendment in 1951.

The respondent operates a branch or chain commercial and savings bank system in this state consisting of a home office located at Spanish Fork, with branches in Delta, Heber, Nephi, Payson and Spanish Fork. The home office does not carry on commercial or savings bank business but serves as a central control point for the auditing and accounting and general supervision and management of the five branches and holds the bond investment account for the whole system. The aggregate assets of the entire system in 1949 totalled $11,828,949.16. In accordance with Secs. 7-1-11 and 7-3-6, U. C. A. 1943, the bank commissioner in 1949 assessed "fees" against each individual branch bank upon its aggregate assets and against the main office upon the aggregate assets of all the branches. Charges against the branches totalled $2,450 and the charge against the main office was $1000.

An examination of the evolution of the banking laws of this state reveals that ever since 1911 there has been on the statutes a law imposing what the Legislature has continuously deenominated a "fee" to cover the cost of examining banks. Chap. 25, Laws of Utah 1911, provided for the appointment of one or more examiners whose duty was to examine every bank and loan, trust or guaranty

association at least once a year and for such examination each bank was required annually to

"pay to the examiner, to be by him deposited in the State Treasury to the credit of the General Fund, a fee"

graduated from $25 on banks with assets of $100,000 or less to $250 on banks with assets of over $25,000,000. In 1913, amendments were made requiring biannual examinations of banks other than savings banks and annual examinations of savings banks for which a "fee" ranging from $20 to $200 for each examination was imposed, depending upon the amount of assets of the bank. Chap. 45, Laws of Utah 1913. By Chap. 18, Laws of Utah 1919, the "fees" were again increased and a new section was added imposing a "fee" of $20 per day for each day required to make examination of building and loan associations. This charge, too, was directed to be paid into the state treasury to the credit of the general fund. Necessary travel expenses of the examiners were also required to be paid by the association examined. Later, in 1929, "fees" for examining building and loan associations were increased to $15 per day for each examiner employed in making the examination. Chap. 95, Laws of Utah 1929. Again, in 1933 the Legislature made amendments to the schedule of "fees," specifying for the first time that they were to cover the cost of both "supervision and examination." Finally in 1935, Sec. 7-1-11, U. C. A. 1943, which is assailed in this action, was enacted. The charges there imposed upon banking institutions were not charges *for each examination,* as had been the case since 1913, but were annual charges *for the "cost of supervision and examination."* Banks with aggregate assets of $100,000 or less were required to pay $100 per year. From there the "fees" ranged upward to where banks with assets of over $15,000,000 were required to pay $1500. A separate schedule was enacted for building and loan associations, and for banking institutions with trust departments, an additional $25 per diem for the chief examiner and $15 per diem for each assistant examiner was required

to be paid. All institutions examined were also required to pay necessary hotel and travel expenses of examiners. By Sec. 7-1-11X, U. C. A. 1943, all "fees" paid to the banking department were directed to be paid monthly by such department to a separate and distinct fund in the state treasury, designated the "financial institutions fund." From this fund, all expenses incurred by the department were to be paid. It was provided that only the amount in the fund at the end of each fiscal year in excess of $25,000 should revert to the general fund. In addition to establishing "fees" for the examination of banking institutions and building and loan associations, the Legislature has since 1917 brought industrial loan companies, cooperative banks for personal credit (now called credit unions), and small loan companies under the supervision of the banking department and has established "fees" for their examination and supervision either on a per diem or hourly basis.

Thus it can be readily seen that the Legislature has from 1911 characterized the charges as "fees" to defray the cost of examining financial institutions. However, the respondent asserts that the charges imposed by Sections 7-1-11 and 7-3-6, U. C. A. 1943, which it paid under protest, were not in fact fees but were taxes because the amount paid bears no reasonable relationship to the amount of work or time consumed by the state banking department in supervising and examining the respondent bank, including its branches. In this regard, counsel have stipulated:

"That because of factors which vary from examination to examination and institution to institution, there is not necessarily a correlation between the amount of the fee charged by the State Bank Commissioner for any particular year and the work actually performed by the State Banking Department in its examining and supervisory capacity during the period. Some of these variable factors are: the general economic condition of the area served by the institution; a comparison of the bank examined with a bank of similar size in other parts of the state and district; comparison of examined banks with other banks of following ratios; percent of total assets to cash and balances with other banks, U. S. Government assets,

total capital accounts; percent of total loan classified by the examiner as being past due, sub-standard, doubtful, for immediate loss; the type, size and number of loans made (for example, less time is consumed in examining where there are ten well secured loans of $10,000.00 each than where there are 100 loans of $1,000.00 each secured by a variety of collateral, each of which must be separately analyzed) ; that the amounts charged as fees are based on aggregate assets as set forth in Sections 7-1-11 and 7-3-6, Utah Code Annotated, 1943."

Respondent relies upon the case of *Smith* v. *Carbon County*, 90 Utah 560, 63 P. 2d 259, 108 A. L. R. 513, as the basis for its contention that the charges imposed by Sections 7-1-11 and 7-3-6 were in fact taxes and not fees. In that case we held that the "fees" set by statute to be charged by county clerks for filing inventories and appraisements in probate matters, which were graduated upwards as the value of the estate increased, bore no reasonable relationship to the extent and kind of services rendered by the county clerk and hence were, in contemplation of law, taxes. We observed that no greater time or responsibility was required of the clerk or of the district judge in probate matters where the appraised value of the estate was high than in matters where the appraised value was low.

We agree that the charges paid by the respondent to the state banking department were taxes and not fees because the charges paid bear no reasonable relationship to the amount of work or time consumed in supervising and examining the respondents banking houses. ■ Instead, the charges were arbitrarily related to assets. In this regard, however, it should be noted that there does not need to be exactitude in establishing fees for the performance of services. It is sufficient if the fee is worked out on an average or bracket basis, that is, a standard fee may be established to be charged in all cases within certain brackets, even though in some cases within the bracket there may be more work to be performed by the person rendering the service than in other cases, pro-

vided that in no case the standard fee is unreasonably in excess of the value of the services rendered.

We think the Legislature has itself recognized that the charges imposed by Secs. 7-1-11 and 7-3-6 are not merely fees but are taxes imposed to raise revenue. From the "financial institutions fund" to which the charges are paid, the Legislature appropriated monies to ■ finance the entire operation of the banking department. The proceeds of the "fund" are not used solely to defray the cost of examining and supervising banking institutions. The banking department has functions and activities other than supervising and examining banks and from the "financial institutions fund" come the monies to carry on those activities. One such activity is in connection with the State Depository Board of which the bank commissioner is president. Through the banking department, the Board checks on all financial institutions in the State wherein public funds are deposited and when necessary examines such institutions to determine whether they are sound and are complying with the State Depository Act, U. C. A. 1943, 74-1-6 et seq. Some of these depositories are national banks and do not pay anything at all into the "financial institutions fund." Furthermore, that part of the "financial institutions fund" in excess of $25,000 which at the end of each fiscal year reverts to the general fund, can be thereafter appropriated by the Legislature for any state purpose.

Having concluded then that the charges imposed upon the respondent to "cover the cost of supervision and examination" by the banking department are not in reality fees, but are taxes, the question is next presented whether they are license or occupation taxes, as contended by the appellant. The distinguishing features of a privilege or occupation tax are pointed out in the following excerpt from 33 Am. Jur. 326:

"In the main, the distinction between a property tax and a license or privilege tax imposed for revenue is that the function of the prop-

erty tax is to raise revenue by virtue of the fact that the property is within the jurisdiction of the taxing power, and no condition or restriction is imposed thereby upon the use of the property taxed, while the license or privilege tax, even though also passed to raise revenue, is imposed upon the right to exercise a privilege, and its payment is made a condition to the exercise, or continuance in the exercise, of the privilege, business, or vocation involved. Although a property tax may constitute a burden upon a business to the extent of the tax, a license or occupation tax may, if not paid, and with its ancillary provisions, bring to an end the business altogether."

See the annotation,

"What is a Property Tax as Distinguished from Excise, License, and other Taxes", at 103 A. L. R. 18.

At no time since 1911 when the Legislature first made provision for the assessing of "fees" for examining banks has the payment of those charges been expressly made a condition precedent to the engaging in the banking business. Nor can such a condition be fairly implied. ■ No authorization is given to the bank commissioner to terminate or suspend the operation of a bank if it fails to pay the "fees" imposed. Sec. 7-2-1, U. C. A. 1943, specifies when the bank commissioner may take possession of the business and property of any institution under his supervision, but the failure to pay the "fees" imposed by Sec. 7-1-11, U. C. A. 1943, is not made a ground. Only with respect to small loan companies has the Legislature, in the field of financial institutions, provided for the payment of a charge as a condition precedent to the doing of business. Chapter 15A, Sec. 2, Laws of Utah 1945, prohibits the engaging in the business of lending in amounts of three hundred dollars or less "without having first obtained a license from the [bank] commissioner." To obtain a license, a "fee" is required to be paid. But this license "fee" is in addition to the charge imposed for the cost of examining the licensee. Sec. 8 provides in part:

"(a) At least once each year the commission or its duly authorized representative shall make an examination of the place of business

of each licensee and of the loans, transactions, books, papers, and records of such licensee so far as they pertain to the business licensed under this act. The actual cost of examination shall be paid to the commissioner by each licensee so examined, and the commissioner may maintain an action for the recovery of such costs in any court of competent jurisdiction."

While it is true, as urged by the appellants, that the Legislature may regulate and restrict the business of banking, clearly it has not made the payment of the "fees" imposed by Secs. 7-1-11 and 7-3-6, U. C. A. 1943, a condition precedent to the engaging in the banking business, whether branch on non-branch. The charge required to be paid by small loan companies in order to secure a license to engage in business is a license or occupation tax. But the "fees" required to be paid "for the cost of supervision and examination" by all financial institutions, including small loan companies, do not have the incidents of a license or occupation tax in that their payment is in no wise a part of or a factor in the conditions upon which the banking business may be engaged in.

Thus we conclude that the charges imposed by Secs. 7-1-11 and 7-3-6, U. C. A. 1943, are not license or occupation taxes. The appellant in its brief has seemingly adopted the position that if the charges cannot be sustained as license or occupation taxes, then they must be ad valorem taxes. This conclusion does not necessarily follow. The field of excise taxes encompasses a great many different kind of taxes, of which license and occupation taxes are but one variety. However, since the appellant has contended itself with such conclusion and the Legislature has amended the statutes imposing the charges since this case was tried below, we are not inclined to explore the field of excise taxes to determine whether the charges assailed here might be sustained as some other form of excise.

The charges imposed by Secs. 7-1-11 and 7-3-6 cannot be upheld as ad valorem taxes on tangible property. Article XIII, Secs. 2 and 3 of our State Constitution set out above,

require tangible property to be taxed in proportion to its value. Yet under these statutes all banking institutions with aggregate assets of over $15,000,000 pay the same tax, viz. $1500. The evidence reveals that there are in this state banks with assets of approximately $80,000,000. Such institutions pay the same amount of tax as would an institution with assets of $15,000,001. Further, under the formula in Section 7-3-6 for assessing charges against branch banks, it resulted that the respondent bank with aggregate assets of $11,828,949.16 paid the maximum charge of $1500. Thus assuming that the charges under consideration are ad valorem taxes on tangible property it is manifest that they were not exacted in conformity with the constitutional mandate that tangible property should be taxed in proportion to its value.

While neither party has contended that the charges paid by the respondent were ad valorem taxes on the privilege to engage in the banking business, such a privilege may well have value and, it would seem, could be taxed as intangible property under Article XIII, Sec. 3 of our State Constitution. Treating the charges as taxes on intangible property, however, it is apparent that they were not imposed in accordance with the above mentioned constitutional provision.

Thus it follows that the respondent is entitled to recover the taxes paid by it under protest. We express no opinion whether Secs. 7-1-11 and 7-3-6, U. C. A. 1943, contravene constitutional provisions other than Art. XIII, Secs. 2, 3.

The judgment below is affirmed. Costs to the respondent.

WADE, McDONOUGH, and HENRIOD, JJ., concur.

CROCKETT, J., not participating.